### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : |
| **Plaintiff,** | : **Civil Action No.** |
| | : |
| **v.** | : |
| | : |
| **DARYL F. HELLER, PARAMOUNT** | : |
| **MANAGEMENT GROUP, LLC, and** | : |
| **PRESTIGE INVESTMENT GROUP, LLC,** | : |
| | : |
| **Defendants.** | : |
| | : |

## COMPLAINT

1.      From at least January 2017 through June 10, 2024, Defendants Daryl F. Heller, Paramount Management Group, LLC ("Paramount"), and Prestige Investment Group, LLC ("Prestige") perpetrated a Ponzi-like scheme exploiting retail investors.  Defendants raised more than $770 million from approximately 2,700 investors and caused losses of approximately $400 million.

2.      Promising an approximately 25% return, Heller and Prestige sold investments in funds that purportedly invested in automated teller machines ("ATMs") managed and operated by Paramount.

3.      Heller used his control of both Paramount and Prestige to create the false impression that Defendants were running a successful, nationwide network of ATMs, paying investors fixed monthly distributions from income earned from pooled ATM transaction fees and related charges.

4.    While Defendants operated a network of ATMs on behalf of investors, they misrepresented the size and profitability of that network to investors and potential investors.

5.    Defendants portrayed investments in the "ATM Funds" which consisted of at least the 26 investment funds managed by Prestige listed in Appendix A attached hereto, as safe, reliable, and able to consistently generate significant returns with the proceeds of their operation.

6.    However, Defendants knew or were reckless in not knowing that the ATM network generated hundreds of millions less in operating income than Defendants needed to fund promised investor distributions.

7.    During the 2017 to 2024 time period, Defendants paid distributions to investors primarily using money raised from new investments and from high-interest, short-term loans from merchant cash advance companies.

8.    During that period, Defendants used only a fraction of investor funds to purchase ATMs, and many of the ATMs they purchased were old machines and in disrepair, which they left sitting in warehouses.

9.    In addition, Heller misappropriated approximately $185 million of investor funds for his own benefit, including for personal expenses, like a beach house on the New Jersey shore, and to finance other businesses he owned.  And he caused tens of millions more to be paid to fund managers who recruited new investors.

10.    In the spring 2024, Defendants' scheme began to collapse.  As investors stopped making new investments, Defendants stopped making payments to existing investors.

11.    From April 2024 through the end of the year, Defendants offered investors a series of excuses and promised future payments and, eventually, claimed that they would buy out the investors' interests in the ATM Funds.  But, despite their promises, Defendants never made any

additional payments.  Through their conduct, Defendants defrauded investors out of hundreds of millions of dollars.

12.     By engaging in the conduct described in this Complaint, Defendants violated, directly or indirectly, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C.§§ 78u(d), 78u(e), and 78aa].

14.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C.§§ 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, Heller resides in this district and Defendants maintain their principal places of business in this district.

15.     In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange.

**DEFENDANTS**

16.    **Daryl F. Heller**, age 55, resides in Lititz, Pennsylvania.  Heller is the founder and

Chairman of the Board of Directors of Paramount.  Heller is the founder and Chief Executive

Officer of Prestige.  Heller is also the managing member, Chief Executive Officer, and majority

owner of Heller Capital Group LLC, which is the majority owner of both Paramount and

Prestige.

17.    **Paramount Management Group, LLC** is a Pennsylvania limited liability

company with its principal place of business in Lancaster, Pennsylvania.

18.    **Prestige Investment Group, LLC** is a Pennsylvania limited liability company

with its principal place of business in Lancaster, Pennsylvania.  "Individual 1" is the Vice

President of Development for Prestige.  "Individual 2" is the President and minority member of

Prestige.

**RELATED ENTITIES**

19.    **Heller Capital Group, LLC** is a Delaware limited liability company with its

principal place of business in Lancaster, Pennsylvania.  In 2014, Heller started Heller Capital

Group, which he described as a "boutique private equity company."  Over time, Heller Capital

Group came to own numerous companies across various industries, including, cannabis,

cryptocurrency, technology, financial services, and a restaurant.  Heller Capital Group is the

majority member of Paramount and Prestige.  Heller is the managing member of Heller Capital

Group.

20.    **Prestige Funds Management, LLC** ("PFM") is a Delaware limited liability

company with its principal place of business in Lancaster, Pennsylvania.  PFM is the manager of

certain funds as listed on Appendix A. (These funds and the funds managed by Prestige Funds

Management II, LLC and Prestige Funds Management III, LLC, described below, are referred to collectively as the "Prestige Funds.")  Prestige is the manager of PFM.

21.    **Prestige Funds Management II, LLC** ("PFM II") is a Delaware limited liability company with its principal place of business in Lancaster, Pennsylvania.  PFM II is the manager of certain funds as listed on Appendix A.  Prestige is the manager of PFM II.

22.    **Prestige Funds Management III, LLC** ("PFM III") is a Delaware limited liability company with its principal place of business in Lancaster, Pennsylvania.  PFM III is the manager of certain funds as listed on Appendix A.  Prestige is the manager of PFM III.

23.    **Company 1** is a Wyoming limited liability company with its principal place of business in Atglen, Pennsylvania.  Company 1 is a minority member of PFM II and PFM III. Company 1 solicits investors for various alternative investments, including the Prestige Funds, through its website, YouTube videos, podcasts, seminars, and emails.  Individual 1 is the founder and CEO of Company 1.

24.    **WF Velocity Funds Management, LLC** ("WFVFM") is a Delaware limited liability company with its principal place of business in Lancaster, Pennsylvania.  WFVFM is a manager of certain funds as listed on Appendix A.  (These funds are referred to as the "WF Velocity Funds.")  (PFM, PFM II, PFM III, and WFVFM are referred to collectively as the "Fund Managers.")  Prestige is the manager of WFVFM.  Individual 3, through one or more entities, is a minority member of WFVFM and operates a website and podcast soliciting alternative investment opportunities, including investments in the WF Velocity Funds managed by WFVFM.

## FACTS

### I.    Heller Controlled Prestige and Paramount

25.    Heller controlled both Prestige and Paramount.  Heller was the managing member of Heller Capital Group, which in turn was the managing member of both Prestige and Paramount.  Heller served as the Chief Executive Officer of Prestige and Chairman of the Board of Paramount.

26.    Between 2017 and 2024, Prestige and Paramount had offices located in the same building in Lancaster, PA, but they had separate employees, separate office space, and separate entrances.

27.    Between at least 2017 and 2024, Heller controlled the flow of information and money between Prestige and Paramount.  Heller had access to the offices, books and records, and bank accounts of both Prestige and Paramount.

28.    Employees for Prestige and Paramount followed Heller's direction.

### A.  Prestige

29.    In 2011, Heller and Individual 2 formed Prestige to invest in ATMs.

30.    Initially, Heller and Individual 2 solicited friends and family to invest in ATMs via Prestige.  They later contracted with Paramount, which was also controlled and managed by Heller, to operate and service the ATMs.

31.    Prestige's ATM network grew, and in 2016, Heller and Individual 2 began creating Prestige Funds, which invested in ATMs.

32.    In approximately 2016, Heller and Individual 2 partnered with Individual 1 and his company, Company 1, to offer membership interests in Prestige Funds to investors.  As set

forth in Appendix A, the Prestige Funds generally had names beginning "Prestige Fund" "A," "B" or "D" followed by roman numerals or additional letters.

33.     In approximately 2020, Heller and Individual 2 partnered with Individual 3 to offer membership interests in the WF Velocity Funds, which were also designed to invest in ATMs.  The WF Velocity Funds generally had names beginning "WF Velocity" followed by roman numerals.

34.     With the creation of the ATM Funds, based on information provided by Heller, Prestige, directly or indirectly through the Fund Managers, handled investor relations, including solicitation and onboarding ATM Fund investors, handling the necessary paperwork, and communicating with potential and existing investors.

35.     Prestige processed all capital activity for investors, receiving investments from and making disbursements to investors.

36.     Prestige also provided account statements and distribution notices to investors in the ATM Funds.  The account statements included the amount of the investment, the monthly distribution history for the year, and the name of the ATM portfolio in which the ATMs were purportedly located.

37.     The distribution notices included additional details regarding the portfolio of ATMs in which the investor had purportedly invested, including monthly statistics on the number of ATMs, ATM transactions, and ATM fee revenue.

38.     Each spring Prestige provided Schedule K-1 tax forms to many investors reflecting their purported share of ATM income and depreciation, and state-specific Schedule K-1 tax forms based on the purported location of the ATMs.

39.     In addition, Prestige provided the ATM Funds, and in some cases individual investors, with bills of sale purporting to show purchases of ATMs.  Prestige obtained the information to include in these forms from Heller and Paramount.  The bills of sale generally included the ATM serial numbers or terminal identification ("TID") numbers (a unique identifier assigned to each ATM that is issued to identify the specific ATM that processed a transaction), the purchase price, the quarter-end date in which the ATMs were purportedly purchased, and, at times, the states where the ATMs were purportedly located.

**B.  Paramount**

40.     In 2011, Heller formed Paramount.  Heller controlled Paramount's operations, financial reporting, and bank accounts.  The private placement memorandum for Prestige Fund D VI states: "Daryl Heller has absolute control of Paramount."

41.     Through Management Services Agreements between Paramount and the ATM Funds, in exchange for compensation, Paramount was responsible for providing ATM operation services to the ATM Funds.

42.     Among other things, Paramount's responsibilities included identifying ATMs to be purchased by the ATM Funds, acquiring the ATMs and selling them to the ATM Funds, entering into location agreements with third-party retailers or other facilities in which the ATMs were placed, installing the ATMs, maintaining the ATMs, and operating the ATMs.

43.     On a monthly basis, Paramount was to transfer money derived from the operation of the ATMs to each of the ATM Funds to pay the investors' distributions, which the ATM Funds were then to transmit to investors.

44.     Paramount's business operations extended beyond its relationship with Prestige and the ATM Funds.  As an ATM Independent Sales Organization, Paramount had agreements with owners or managers of ATMs to facilitate the processing of ATM transactions.

## II.     The ATM Funds

45.     The Prestige and WF Velocity Funds consisted of at least 26 Funds which invested in ATMs.  The LLC membership "interests" or "units" offered and sold in the ATM Funds are securities.

46.     The ATM Funds pooled investors' money.  The pooled money was to be used to purchase ATMs, which were combined into investment portfolios, and the expected revenue from the ATMs was to be pooled and distributed to investors on a pro-rata basis.

47.     The investors were passive.  The investors did not control how the money they invested was used and expected the profits on their investments to be derived from the efforts of others, including Heller and Paramount.

48.     Heller was responsible for determining when a particular ATM Fund was opened or closed for investment, and the size of the offering.  Heller was also responsible for directing the flow of investor cash from the ATM Funds to Paramount.  And, he oversaw the creation, management, tracking, and dissemination of bills of sale to the ATM Funds.

49.     Paramount, under Heller's direction, was responsible for purchasing, operating, and maintaining the ATMs, and the associated costs, and sending revenue to the ATM Funds.

### A.  The ATM Funds' Structure and Terms

50.     While there are some differences across funds, for the most part, the structure of the funds, language in the offering documents, and financial terms of the investments were relatively consistent.

51.     Heller controlled the drafting of private placement memoranda and other offering materials.

52.     The offering documents for the ATM Funds generally provided that, for a minimum investment of $52,000 (or for some funds, $104,000), investors could purchase interests in an ATM Fund, which would pay investors a set monthly distribution payment for a period of seven years.

53.     Through these offering materials, Heller and Prestige represented to investors that their investment would be used to acquire and operate ATMs.

54.     For example, Prestige Fund D VI's private placement memorandum states: "The Fund intends to use the entirety of an Investor's capital contribution to purchase and operate ATMs."  Similar representations were made by other funds.

55.     The offering materials also represented that the payments to investors would derive from the revenues generated by the operations of the ATMs that the fund purchased, and that investors would receive the return of their principal plus a profit over the seven years.

56.     For example, Prestige Fund D VI's private placement memorandum provided that for the purchase of a membership interest for $52,000, an investor would receive $1,081 per month for eighty-four months.  The private placement memorandum states: "Distributions will be made through profits of the Fund derived through the Fund's ownership and operation of ATMs."  Similar representations were made by other funds.

57.     Investors were paid monthly and, after investors received their payments from the ATM revenues, the Fund Managers were to receive payment.  Prestige and the Fund Managers referred to the payments to the Fund Managers as "margin payments."

58.    Pursuant to the offering materials, if the ATM Funds were unable to use the investments to purchase ATMs, the deal was to be rescinded, and the investment returned to the investor.

59.    The offering materials provided that at the end of the seven-year period, Paramount paid investors a small amount for the scrap value of the ATMs.  And, at the end of the seven-year period, Prestige emailed investors to solicit investment in a new ATM Fund.

60.    Many investors invested in multiple ATM Funds.

**B.  Some Funds Differed**

61.    While most of the (at least) 26 ATM Funds sold a membership interest in a pool of ATMs, the Prestige A Funds and WF Velocity I fund, which include 8 of the ATM Funds, purported to sell investors physical ATMs, which were maintained and operated by Paramount. *See* Appendix A for a list of funds and ATM ownership structures, though certain funds may have had more than one manager involved.

62.    In practice, however, investment in the Prestige A Funds and WF Velocity I Fund worked the same as investment in the other funds in that investors made passive investments in increments of $52,000 (or for certain funds $104,000); those investments were pooled to supposedly purchase a portfolio of ATMs; and the anticipated investment returns were to be pooled, equalized, and paid to investors in the funds on a pro-rata basis.

63.    Like investors in the other ATM Funds, investors in the Prestige A Funds and WF Velocity I Fund had no right to select, control, or operate the ATMs.

64.    And, as with the other ATM Funds, investors who invested in the Prestige A Funds and WF Velocity I Fund were passive and expected the profits on their investment to be derived from the efforts of others, including Heller and Paramount.

65.     In addition, two of the ATM Funds, Prestige Fund B BTM I and Prestige Fund D BTM I, held Bitcoin ATMs.  Investments in these funds were supposed to function the same as the investments in the other ATM Funds but differed by requiring investment in increments of $120,000 and paying a set monthly distribution payment for a period of six, not seven, years.

66.     For all of the ATM Funds, regardless of their structure, Heller had authority over where investor money was sent, what money was provided to investors, and false information provided to investors and prospective investors about the performance of the ATM Funds.

### III.    Defendants Solicited Investors

67.     In total, across the ATM Funds, approximately 2,700 investors, most of whom were retail investors, invested a total of at least $770 million.

68.     Many of the investors were members of the Amish and Mennonite communities in the Lancaster, Pennsylvania area, the same area where Heller resides.

69.     Defendants, on their own and acting with and through others, including Individuals 1, 2, and 3, solicited investors in the ATM Funds through email, podcasts, YouTube videos, meetings, seminars, and investor presentations.

70.     Marketing materials provided to investors, which Heller participated in drafting, promoted the benefits of investing in the ATM Funds, including consistent projected returns, growth in ATM usage, collateral (i.e., the ATMs) backing the investment, and risk management provided by a federally chartered bank, which allowed Paramount to route transactions through its network of ATM processors.

71.     Heller and Prestige prepared and disseminated the marketing materials.

72.     Heller reviewed and approved investor presentations shown to investors and potential investors.

73.    Marketing brochures for some ATM Funds, titled ATM Investment Summaries and Executive Summaries, which were provided to investors and potential investors, stated that ATMs were compliant with industry standards, and that "[a]lmost exclusively, these ATMs are replacing existing ATMs."

74.    ATM Investment Summaries and Executive Summaries also stated that Paramount had "performed 24+ month of diligence on transactional data" in selecting the ATM portfolio being acquired.

75.    In addition to marketing the investment in the ATM Funds as profitable with low risk, Heller and Prestige also touted certain tax benefits, claiming investors could take depreciation on the ATM assets, which allowed investors to allocate and deduct the cost of the ATMs.

76.    ATM Investment Summaries and Executive Summaries included a table setting forth the projected investor returns for 7 years, including net cash flow and depreciation impact per year.  These summaries advertised investor profits of approximately 25%.

77.    Heller drafted the language and the projected return tables found in the Executive Summaries, which were also incorporated into the ATM Investment Summaries.

78.    In ATM Investment Summaries and Executive Summaries and other Prestige marketing materials, Prestige, directly and through others, touted Prestige's consistent historical returns, Paramount's ranking as a top 5 ATM operator in the United States, tax benefits, and the investment in the ATM Funds being a hedge against market risk.

79.    Heller and Individual 2 directly solicited investors both locally and out of state, and Individual 1 and Individual 3 promoted the ATM Funds to investors across the United States, including through their respective websites and podcasts.

80.     Individual 1 appeared frequently as a guest on alternative investment podcasts and was also a featured speaker at seminars on alternative investments.

81.     On several occasions, Heller joined Individual 1 or Individual 3 for online presentations and participated with Individual 1 in seminars for prospective investors in Lancaster.  Heller also traveled out of state to join Individual 2 in meetings with investors.

## IV.    The ATMs Generated Insufficient Revenue to Make the Agreed Upon Payments to Existing Investors

82.     Defendants knew that between 2017 and 2024, the ATMs owned by the ATM Funds generated insufficient revenue to pay the promised distributions to investors.  Defendants also knew that during this period, they were using new investments to pay earlier investors because of this shortfall and that Heller was taking tens of millions of dollars for other improper purposes, including to support other businesses he owned.

83.     Paramount accounting personnel prepared and disseminated to Heller (and others) monthly financial reports that detailed the operating performance of Paramount's ATM network, which included the ATMs owned by the ATM Funds and ATMs owned by third-parties.

84.     These reports reflected profit and loss statements and calculated gross profit and net operating revenue.

85.     According to these reports, the gross profit reflected the ATM network revenue (*e.g.*, surcharge transaction revenue) less direct costs associated with operating the ATM network (*e.g.*, commission payments to ATM location operators).

86.     The reports calculated net operating income by deducting from the "gross profit" certain indirect costs associated with operating Paramount's business, such as salaries, rent, and utilities.

87.    Defendants did not provide these monthly financial reports to investors in the ATM Funds.

88.    During the period 2017 through 2024, as set forth in the table below, investor distributions exceeded gross profit and net operating income by $310 million and $368.5 million, respectively.

| (in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Q1 2024 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Gross Profit | $ 3.8 | $ 8.9 | $ 9.4 | $ 11.8 | $ 16.6 | $ 15.6 | $ 17.2 | $ 3.9 | $ 87.1 |
| Net Operating Income | (0.1) | 1.9 | 3.1 | 4.9 | 7.5 | 4.8 | 5.5 | 1.0 | 28.6 |
| Investor Distributions | 1.2 | 7.0 | 13.8 | 27.8 | 53.5 | 93.7 | 151.9 | 48.1 | 397.1 |

89.    Because the ATM network did not generate sufficient profits to fund investor distributions, the Defendants primarily relied on new investor capital to cover the massive shortfall.

## V.    Defendants Defrauded Investors

### A.    Defendants Misrepresented the Source of Investor Distributions and Concealed from Investors that Distributions Were Funded by Ponzi-Like Payments and High-Interest Rate Loans Arranged by Paramount and Heller

90.    Defendants misrepresented the source of funds used to pay investor distributions.

91.    Private placement memoranda, approved by Heller, falsely represented that investor monies would be used to purchase and operate ATMs and that monthly distributions to investors were paid from revenues derived from the operation of ATMs.  Account statements and distribution notices provided to investors falsely claimed that Defendants had spent investor funds to purchase and operate ATMs and that the ATMs were sufficiently profitable to pay the investor distributions.

92.     In reality, Defendants funded investor distributions largely by using new capital contributions from other investors and partially from loans from multiple merchant cash advance companies.

93.     Indeed, contrary to what Heller and Prestige told investors, only a fraction of investor funds were actually used to purchase ATMs – and many of the ATMs that Paramount purchased were not operational and produced no revenue.

94.     ATM Investment Summaries and Executive Summaries provided to investors and prospective investors falsely claimed that ATMs were compliant with industry standards and that Paramount had conducted due diligence on the ATM portfolios being sold to investors.

95.     In practice, Heller directed Paramount to use investor monies to buy inexpensive ATMs or used and, at times, damaged ATMs with missing keyboards and hard drives, at prices that were much lower than what Paramount reported to the ATM Funds.

96.     Oftentimes, Paramount, at Heller's direction, then stored the ATMs in warehouses around the country where they remained offline and generated no income at all.

97.     For example, equipment sale agreements and invoices show that between 2021 and 2022, Paramount acquired at least 3,600 ATMs from "ATM Supplier 1," many of which were damaged or otherwise inoperable, for a total price of $1.9 million, or approximately $527 per ATM.

98.     Heller, through Paramount, negotiated with ATM Supplier 1 to store the purchased ATMs in a warehouse in exchange for a monthly warehousing fee until Paramount authorized shipment.  Heller also arranged for ATM Supplier 1 to provide the serial numbers to Paramount for the purchased ATMs within a six-month period.

99.     At Heller's direction, Paramount then sold approximately 2,300 of these ATMs to the ATM Funds—and at Heller's direction, Prestige caused the ATM Funds to purchase these ATMs—for $52 million, a markup of more than 4,200%.  Paramount and Heller provided bills of sale to Prestige containing serial numbers from the ATMs, without disclosing to investors that the ATMs were sitting unused in warehouses.

100.     These ATM sales to the ATM Funds generated more than $50 million for Heller and Paramount, which could be used to make payments to earlier investors in a Ponzi-like manner and/or to funnel money to Heller's other businesses.

101.     Other times, at Heller's direction, Paramount failed to purchase any ATMs for investors, despite receiving funds from Prestige.

102.     For example, in November 2023, Heller caused Defendants to use substantially all of $14.5 million in new investments to pay off earlier investors.  Specifically, between November 7, 2023 and November 29, 2023, various Prestige Funds raised approximately $14.5 million and transferred substantially all of that money to Paramount.  During the same period, Paramount transferred substantially all of that money to various ATM Funds to pay earlier investors.

103.     In addition, Defendants also used loans from merchant cash advance companies and other sources to supplement Paramount's funds to meet monthly investor payment obligations.

104.     For example, in early April 2024, Heller caused Paramount to enter into an agreement to sell nearly $2.7 million of its future ATM receivables from various Prestige and WF Velocity Funds to "Merchant Cash Advance Company 1" for an upfront payment of $2 million.

105.     Essentially, Paramount borrowed $2 million from Merchant Cash Advance Company 1 and agreed to pay back nearly $2.7 million only twenty weeks later.  After Merchant

Cash Advance Company 1 wired $1.94 million to a Prestige-related account, that money was immediately transferred to an ATM Fund, Prestige Fund D V, and used to make distributions to investors.

106.     Heller's practice of using high-interest loans to fund distribution payments only further exacerbated the shortfall between the revenue that the ATMs generated for the ATM Funds and the amounts that Prestige promised to pay investors.

107.     Contrary to what Defendants told investors and prospective investors, the ATMs did not generate sufficient revenues to pay investors their distributions.  Instead, there was a massive shortfall, and Defendants used money from new investments and loans from merchant cash advance companies and other sources to make payments to investors.

**B.  Defendants Misrepresented the Size and Profitability of the ATM Network**

108.     During the relevant time period, 2017 through 2024, Heller and Prestige, directly or through the Fund Managers, told prospective investors through private placement memoranda, marketing materials, and investor presentations that their capital contributions would be pooled with the capital contributions of other investors in the ATM Funds and would be used to purchase and operate ATMs.  They also told investors that their distribution payments would come from the revenues generated by the ATMs.  Heller and Prestige knew or were reckless in not knowing that these representations were false.

109.     Prestige misrepresented to investors and prospective investors that Paramount would purchase ATMs using their investments and falsely led current investors to believe that ATMs had been purchased on their behalf.

110.    In reality, only a small portion of the ATMs that Prestige represented that Paramount purchased for the benefit of the ATM Fund investors were actually purchased and deployed.

111.    Instead, Paramount, at Heller's direction, often either purchased ATMs that it stored in warehouses, or never purchased the ATMs at all.

112.    As a result, Defendants inflated the number of ATMs they claimed that the ATM Funds owned and the revenue generated by those ATMs.

113.    At Heller's direction, Prestige created account statements and distribution notices that were provided to investors containing false information regarding the number of ATMs in operation.

114.    Heller and Paramount provided the false information to Prestige regarding the number of ATMs and revenue generated by the ATMs.  Heller directed Prestige employees to create the monthly statements and distribution notices and provide them to investors. Heller and Paramount also caused Prestige to distribute bills of sale with false information to the ATM Funds or investors.

115.    In addition, each spring, Prestige, under Heller's direction, provided Schedule K-1s to many investors for tax purposes.  The schedule K-1s, which also contained false information, included the investors' purported share of ATM revenue and depreciation, and state-specific Schedule K-1s based on the purported location of the ATMs.

116.    Paramount's internal records that were provided to Heller contradict the inflated numbers Defendants reported to investors in the distribution notices.

117.    Paramount's accounting department's monthly financial reports provided detailed information to Heller concerning Paramount's ATM network, including active ATMs and profits and losses generated by the ATMs.

### 1. Paramount's Internal Records Show Fewer ATMs than Defendants Reported to Investors

118.    There were substantial discrepancies between Paramount's internal reports, which were provided to Heller, and the information provided to investors via distribution notices regarding the number of ATMs in service.  Aggregating the distribution notices makes these differences clear.  For example, for the first quarter of 2022, the aggregated distribution notices show that Prestige reported to investors that the ATM Funds had 12,907 ATMs in service, but the internal Paramount records reflect only 7,381 ATMs—a difference of more than 5,500 ATMs. Similarly, for the third quarter of 2023, the aggregated distribution notices show that Prestige reported to investors that the ATM Funds had 27,807 ATMs in service, but the internal Paramount records reflect only 17,244 ATMs—a difference of more than 10,500 ATMs. Moreover, the discrepancy is likely even greater because Paramount's internal reports included ATMs not owned by the ATM funds.

119.    Many investors made additional investments in the Prestige ATM Funds after receiving false information in distribution notices.

120.    Heller knew or was reckless in not knowing that the information being provided to investors about the number of ATMs was false or misleading.

**2. Defendants Misrepresented the Amount of Revenue Generated by the ATMs Owned by the ATM Funds**

121.    Heller also caused Prestige to report inflated revenues generated by the ATMs owned by the ATM Funds through monthly emails containing false portfolio statistics provided to a Prestige employee, which were included in distribution notices to investors.  Again, aggregating the distribution notices provided to investors makes this clear.

122.    The table below compares the total ATM fee revenue (in millions) reflected across the distribution notices provided to investors to the operating revenue reflected in Paramount's internal monthly financial reports.

| (in millions) | ATM Fee Revenue Per: | | |
|---|---|---|---|
| Period | Investor Distribution Notices | Internal Paramount Records | Difference |
| Q1 2022 | $ 50.0 | $ 17.4 | $ 32.6 |
| Q2 2022 | 55.8 | 20.4 | 35.4 |
| Q3 2022 | 59.4 | 20.4 | 39.0 |
| Q4 2022 | 64.0 | 20.0 | 44.0 |
| Q1 2023 | 98.2 | 22.6 | 75.6 |
| Q2 2023 | 106.6 | 29.4 | 77.2 |
| Q3 2023 | 113.0 | 36.3 | 76.7 |
| **Subtotals** | **$ 547.0** | **$ 166.5** | **$ 380.5** |

123.    For example, for the first quarter of 2022, using false data provided by Heller and Paramount, when aggregating the distribution notices, Prestige represented to investors that the network of ATMs held by the ATM Funds generated $32.6 million more in fee revenue than reflected in Paramount's own internal reports.

124.    Over the twenty-one-month period between January 2022 and September 2023, Prestige falsely represented to investors that the ATMs held by the ATM Funds generated more

than $380 million more in fee revenue than they actually did.  (And, as with the number of ATMs in operation, the amount of revenue reflected in Paramount's internal reports is likely also inflated.)

125.     These representations created the false impression that Paramount was operating one of the country's largest ATM networks, producing significant profits and cash flows capable of funding monthly distribution payments to investors – and that those cash flows were increasing.

126.     The distribution notices disguised the fact that, contrary to what Prestige and Heller told investors, significant numbers of ATMs had never been purchased or were stored in warehouses and not operating, and actual revenue from ATMs was insufficient to pay the distributions to investors.  Contrary to what Heller and Prestige told investors, distributions to investors were being largely funded by new capital contributions from other investors.

127.     Many investors made additional investments in the Prestige ATM Funds after receiving false information in distribution notices.

128.     Heller knew or was reckless in not knowing that the information being provided to investors about the ATM revenue was false or misleading.

## C. Defendants Deceived Investors and Potential Investors with Rigged ATM Portal

129.     In addition to providing investors with false documents, Defendants engaged in other deceptive conduct during presentations for investors held in Prestige's and Paramount's offices.

130.     Heller and Paramount manipulated Paramount's ATM portal to make the network of ATMs appear more profitable.

131.    Heller instructed a Paramount employee to create a portal subset that included only several hundred of Paramount's highest transaction-volume ATMs.

132.    At an in-person presentation regarding the ATMs held by the ATM Funds and as part of investor due diligence, investors were allowed to select ATMs at "random" from what they were led to believe was the complete set of the ATMs held by the ATM Funds, to see the details of the performance of specific ATMs.  However, in reality, they were selecting from the cherry-picked subset consisting of high-performing ATMs that Heller had directed the Paramount employee to create.

133.    Heller did not disclose to the investors that they were "randomly" selecting from the cherry-picked subset of ATMs, so that any ATM selected would be assured to be high performing.

**D. Defendants Misappropriated and Misused Investors' Funds**

134.    In addition to deceiving investors to conceal that Defendants were using some of their investments to make Ponzi-like payments to earlier investors, Defendants also failed to disclose to investors that they were comingling funds, misusing investors' funds, and misappropriating investors' money for the benefit of Heller and entities affiliated with him.

135.    Between 2017 and 2023, Heller took investor money for his own benefit, causing more than $185 million to be transferred from Paramount to various entities owned and/or controlled by Heller.

136.    For example, Heller directed that $92 million be transferred to a family of companies referred to as Blackford, which are companies primarily owned by Heller, to repay outstanding loan obligations, pay operating expenses, and make distributions to other entities Heller controlled.

137.    Similarly, approximately $45 million was transferred to Heller Capital Group, Heller's holding company, that directed his personal investments in various industries and was otherwise used by Heller to make transfers to his personal bank account.

138.    And, approximately $27 million was cumulatively transferred to two cannabis-related businesses owned by Heller.

139.    The ATM Funds did not have any ownership in the Blackford companies, Heller Capital Group, or the cannabis-related companies, and did not participate in, or benefit from, distributions paid from the transfers from Paramount to these entities.

140.    Heller used investor funds that were transferred to Heller Capital Group bank accounts for personal expenses, including $3.8 million for personal tax payments.  He also used approximately $1.5 million from a Paramount account for the purchase of a beach house.

141.    In addition, Heller misused investor funds by causing millions in payments to be made to Fund Managers.

142.    Fund Managers' duties included, among other things, recruiting new investors.

143.    According to the private placement memorandums for most funds, margin payments were to be made to Fund Managers only if revenues received from the ATMs exceeded obligations due to investors and other expenses.

144.    As noted above, because of the lack of actual substantial ATM revenue generated at Paramount, there was not *excess* ATM revenue, but instead a shortfall.  Heller knew that the money sent to the ATM Funds from Paramount consisted mostly of re-circulated investor funds, and not ATM revenue.

145.    Nevertheless, Heller caused margin payments to be sent to the Fund Managers totaling at least $60 million ($8.2 million of which went back to Heller himself).

**VI.    Defendants' Fraud Unravels**

**A.  Without Money from New Investments, Defendants Failed to Pay Existing Investors**

146.    When investors stopped making new investments, Defendants' scheme collapsed.

147.    In 2023, Individual 1 asked Heller for financial performance information, including audited financial statements, for Paramount and Prestige.

148.    In December 2023, after Heller failed to act on Individual 1's request, Individual 1 told Heller that he would not solicit any new investments.

149.    Individual 1 did not bring in any investments in 2024.  Subsequently, by April 2024, Individual 3 also did not bring in any investments.

150.    In April 2024, with the spigot of new money running dry, Prestige stopped paying monthly distributions to investors.

**B.  Heller Offers Excuses for the Failure to Pay**

151.    Heller provided investors with false and misleading excuses for the failure to pay distributions, including the cost of compliance with required ATM upgrades, Paramount's purported acquisition of a large ATM portfolio resulting in short-term cash flow issues, and a potential buyout of investors by an unnamed private equity firm.

152.    In an email dated April 29, 2024—the day before a monthly payment was due—Heller declared to the ATM Fund investors that the monthly payment was being changed to a quarterly payment and that the next payment would be made on June 30, 2024.  However, no quarterly payment was made in June 2024 or afterward.

153.    Subsequently, Heller informed investors that the quarterly payments would not be made, but that he would "buy out" the investors' interests.  The purported buyout never happened.

### C.  Heller, Paramount, Prestige and Others Are Sued

154.    Between 2017 and June 2024, Defendants obtained approximately $770 million from investors in the ATM Funds, and have injured those investors by approximately $400 million.

155.    By the summer of 2024, as Heller continued to promise investors that distribution payments were forthcoming and continued to miss payment deadlines, private lawsuits were filed.

156.    First, Individuals 1, 2, and 3 led litigation efforts on behalf of the ATM Fund plaintiffs against Paramount, in *Prestige Fund A, LLC v. Paramount Management Group, LLC*, No. CI 24-06012 (Pa. Com. Pl.) ("ATM Fund Litigation").

157.    In addition, various third parties, including merchant cash advance companies, banks, and ATM vendors began filing lawsuits against Heller, Paramount, Prestige, the ATM Funds, and other Heller entities.

158.    Numerous actions were brought by lenders and Lancaster area banks alleging breach of contract relating to Heller's failure to make payment on loans secured by sales of future ATM receivables or for which the ATMs had been pledged as collateral.

159.    In February 2025, Heller filed for Chapter 11 bankruptcy in New Jersey, where he owned a beach house.  In his bankruptcy petition, Heller listed unsecured claims totaling $137.4 million.

### D.  While the ATM Fund Litigation Was Pending, Heller Sold Portfolios of ATMs with No Benefit to the ATM Funds and Failed to Turn Over the ATM Network as Required

160.    While the ATM Fund Litigation was pending, Heller and Paramount negotiated additional time to purportedly seek a buyout of the investors' interests.  However, during those

delays, Heller and Paramount sold various portfolios of ATMs for millions of dollars. They did not remit the proceeds of these sales to the ATM Funds, but instead used them for other purposes.

161.    In addition, on or about November 6 and 7, 2024, Heller created and circulated doctored purchase agreements purporting to demonstrate a deal to buy out the ATM Funds' investors' interests.

162.    In addition, on or about November 13, 2024, pursuant to a Court approved stipulation, Heller and Paramount were to provide the Plaintiffs in the ATM Fund Litigation with the inventory of ATMs and transfer title to the ATMs and information necessary to operate them. Heller failed to comply.

163.    Despite the stipulation and Court order, on or about November 21, 2024, Heller sold ATMs belonging to the ATM Funds to a third-party and did not remit the proceeds of the sale to the ATM Funds.

164.    In or around mid-December 2024, Paramount terminated a majority of employees and ceased operations.

## VII.    Defendants Violated the Federal Securities Laws

165.    During the period 2017 through 2024, Defendants defrauded investors and potential investors in the ATM Funds.

166.    Defendants engaged in deceptive conduct including, but not limited to, falsifying documents; using money from new investments to pay earlier investors; creating the cherry-picked subset of the purported ATM network so that investors could only "randomly" select high-performing ATMs; and misrepresenting, among other things, acquisition and operation of ATMs, the number of ATMs owned and operated, the revenue generated by the ATMs, the cost of the ATMs, and the tax depreciation associated with the ATMs.

167.    Defendants obtained money or property by means of false statements to investors, including investor funds that were transferred from the ATM Funds to Paramount, margin payments and other investor funds that were transferred to Prestige, and money that Heller misappropriated from investors.

168.    All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material.

169.    Defendants acted knowingly and/or recklessly.  Among other things, Heller, Paramount, and Prestige knew, or were reckless in not knowing, that they were engaging in deceptive conduct and making materially false and misleading statements in connection with the purchase, sale, or offer for sale of securities.  For example, Heller knew, or was reckless in not knowing that when he was soliciting investors, Prestige and Paramount were not using investor funds as intended and investors were largely being repaid with new investor money, not with revenues from ATMs.  Heller also knew, or was reckless in not knowing, that he misappropriated funds.

170.    Heller and Prestige made false statements of material fact and omitted to state material facts necessary to make statements made not misleading.

171.    Heller and Prestige made false and misleading statements to existing investors and prospective investors in the materials and other written communications to existing investors and prospective investors.

172.    Defendants employed a device, scheme or artifice to defraud and engaged in acts, transactions or courses of business that operated as a fraud or deceit upon investors.

173. In perpetrating the fraud, Defendants used the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, including by sending numerous documents containing false statements via e-mail.

174. The conduct described herein was in connection with the purchase or sale of securities and in the offer or sale of securities.

175. Defendants used the means or instruments of interstate commerce or the mails, including e-mails, to perpetrate their fraud.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

176. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 175, inclusive, as if they were fully set forth herein.

177. By engaging in the conduct alleged herein, Defendants Heller, Paramount, and Prestige knowingly or recklessly or, with respect to subparts b and c below, at least negligently, in the offer or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

     a.   employed devices, schemes or artifices to defraud;

     b.   obtained money or property by means of untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     c.   engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

178.    By engaging in the foregoing conduct, Defendants Heller, Paramount, and Prestige violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Defendants Heller and Prestige)

179.    The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 175, inclusive, as if they were fully set forth herein.

180.    By engaging in the conduct alleged herein, Defendants Heller and Prestige directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, in connection with the purchase and sale of securities described herein, knowingly or recklessly:

    a.   employed devices, schemes, or artifices to defraud;

    b.   made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.   engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

181.    By reason of the foregoing, Defendants Heller and Prestige, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder
### (Defendant Paramount)

182.    The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 175, inclusive, as if they were fully set forth herein.

183.    By engaging in the conduct alleged herein, Defendant Paramount directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, in connection with the purchase and sale of securities described herein, knowingly or recklessly:

    a.    employed devices, schemes, or artifices to defraud; and

    b.    engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

184.    By reason of the foregoing, Defendant Paramount, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)] and Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by committing or engaging in specified actions or activities relevant to such violations.

## II.

Ordering Defendants to disgorge all ill-gotten gains with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Ordering that Defendant Heller is barred from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Ordering that Defendant Heller is enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

## VI.

Granting such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Respectfully submitted,

By:  s/ John V. Donnelly III

John V. Donnelly III, Esq.
Gregory Bockin, Esq.
Julia C. Green, Esq.
Suzanne Abt. Esq.
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
E-mail:  DonnellyJ@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

Dated:  September 3, 2025

# APPENDIX A

